Jesus Jose Ossorio v. Commissioner.
Ossorio v. Commissioner
Docket No. 395.
United States Tax Court
1947 Tax Ct. Memo LEXIS 111; 6 T.C.M. (CCH) 942; T.C.M. (RIA) 47232; August 14, 1947
*111 Thomas Witter Chrystie, Esq., for the petitioner. Ellyne E. Strickland, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner seeks a redetermination of deficiencies in income tax and penalties for failure to file returns, in the following amounts for the taxable years 1937 to 1940: Deficiency
Penalty
1937
$299.79 $ 1938
285.86
71.47
1939
60.54
15.14
1940
5.82
1.46
The deficiencies represent the difference between the tax withheld at the source and the tax computed on the basis of attributing to petitioner all of the income from an account in petitioner's name at City Bank Farmers Trust Company, New York; petitioner contending that a portion of the corpus of the account did not belong to him individually but was held under an oral trust for another. Findings of Fact Petitioner is, and was during the years 1937 to 1940, inclusive, a citizen of the Philippine Islands, now the Commonwealth of the Philippines, with his principal office in Manila, P. I. Throughout the taxable years he was a nonresident of the United States, and did not engage in trade or business nor *112 maintain an office or place of business within the United States. Petitioner's paternal grandmother, Dofia Josefa Cembrano de Ossorio, died in December, 1919, a resident of the Philippine Islands, leaving surviving as her next of kin one son, Miguel, then married to his third wife, Maria Alvarez, and one granddaughter, Maria Ossorio (Caswell), the daughter of her deceased son, Francisco. Her son Miguel had seven children living at the time of his mother's death; namely, Miguel J., Francisco, Jesus J. (petitioner herein), and Antonio, children of his first wife; Juan, child of his second wife; and Maria and Carlos, children of his third wife. By her will, petitioner's grandmother devised and bequeathed her estate, as follows: (a) One-third, as required by law, outright equally to her heirs per stirpes, so that her son Miguel, then a resident of Madrid, Spain, received one-sixth outright, and her granddaughter, Maria Ossorio (Caswell) received the other one-sixth outright. (b) The second third of her estate, which under the Philippine law she could leave to any of her descendants, equally (1/15th each) among the five children of her son Miguel by his first and second marriages, *113 namely, Miguel J., Francisco, petitioner, Antonio, and Juan; Miguel's third wife and her two children being deliberately ignored since the testatrix did not know them. (c) The last third, available for disposition by the testatrix to anyone she might choose, and the income from which forms the basis of the present controversy, was left in the will to petitioner, subject to the oral understanding that it would be used to take care of the testatrix's son, Miguel, petitioner's father, during his lifetime. The testatrix had originally intended to leave the last one-third outright to her son, but after discussing the matter with her grandsons, she feared that because of his improvident nature he might soon exhaust the fund and be without means to care for himself. The one-third share, so received by petitioner, amounted to approximately 200,000 pesos or $100,000. The one-sixth share left outright to Miguel having been consumed to pay his debts, a portion of the income from the one-third left petitioner was paid to Miguel as an allowance during his lifetime. Miguel died about one year after the death of the testatrix, and a part of the legacy was then used to pay some of his additional *114 debts. After Miguel's death petitioner made regular distributions of income to his father's widow in Spain, for the benefit of herself and her two children, during the period from 1920 to 1946, inclusive, except that during the period 1942 to 1945, when petitioner was in the custody of the Japanese in the Philippines, his brother made monthly remittances to the family in Spain, for which he was reimbursed by petitioner after the war. During the taxable years involved herein the allowance was 400 pesos or $200 a month. The manner of distribution and amount thereof were in petitioner's sole discretion, although prior to his brother's departure to the United States in 1928 he did discuss these matters with his brother. Not all of the income was remitted to Miguel's widow, the remainder being invested and used to build up the principal of the fund, as to all of which petitioner had been given full discretion. In 1946, following his release from the Japanese, petitioner divided into six parts the corpus of the fund which he had accumulated from the one-third share of his grandmother's estate, and distributed one-half of the corpus to his stepmother and her two children; the remaining *115 one-half was divided equally among his brother Francisco, the widow of his deceased brother Antonio, and his half-brother Juan. The income of the portion distributed by petitioner to his stepmother and her children was sufficient to provide a monthly allowance equal to that which was theretofore sent to her and the children. No member of the family ever questioned the propriety of the distributions made by petitioner, or his decisions with respect to the handling of the fund. At any time he could have stopped payment or changed the amount of allowance remitted to his stepmother in Spain. In the years 1937, 1938, 1939, and 1940 petitioner maintained a custody account in the City Bank Farmers Trust Company, of New York City, in which account were kept certain United States securities. So far as the records of the Trust Company indicated, all the securities in this account belonged to petitioner. These securities produced dividend income from sources within the United States, on which tax was withheld at the source, in the following amounts: Tax Withheld
at Source
Years
Gross Amount
Rate
Amount
1937
$24,561.70
10%
$2,456.17
1938
24,435.10
10%
2,443.51
1939
22,250.40
10%
2,225.04
1940
24,034.00
16 1/2%
3,965.77
*116 Petitioner estimated that about $5,000 per year of the gross amount represented income on that portion of the principal which he considered as not belonging to him individually. Respondent determined that petitioner's income from sources within the United States was in excess of $24,000 for 1940, and $21,600 for the earlier years, and found deficiencies under Internal Revenue Code, section 211 (c), and the comparable provisions of the earlier applicable revenue acts. Petitioner was the beneficial owner of the total income earned on the account for each of the years involved. Petitioner's failure to file nonresident alien income tax returns for 1938, 1939, and 1940 was not due to reasonable cause. Opinion Taking at its full face value, which we are quite prepared to do, petitioner's account of the operative facts, we must conclude, however reluctantly, that they fall far short of establishing any trust whatever in the years under review. Petitioner's own testimony, and that of his brother in his behalf, deal with only two aspects bearing on the central issue. The first is that petitioner's grandmother left the property in question to him on the understanding *117 that it was to be used for his father's benefit during the father's lifetime. But the father died shortly after the testatrix, and many years before the beginning of the tax period in controversy. No slightest suggestion appears that she made any disposition apart from the will, even an oral or informal one, of the remaining beneficial estate. It may be assumed that the father was a comparatively young man when she died and that she expected him to survive her by many years, and was indifferent thereafter to the destination of the property. In fact, the least likely beneficiaries of the remainder interest from her standpoint would have been the very ones upon whom petitioner decided to confer the bulk of it, - his father's widow and their two children. For these, on petitioner's own theory, were deliberately excluded from all of the testatrix's benefactions. But whatever the testatrix's motivations, it seems clear from the record that she imposed no trust obligation upon petitioner after his father's death. The only remaining testimony relied upon by petitioner is that he had no beneficial right to any of the funds. But that statement by him and his brother appears to be no more *118 than their conclusion from the original arrangement. It is not suggested that any such restriction was specified by the testatrix herself, but only in the brother's words that "I don't think he had any right. Not if he is honest, and he is." The original trust, confined as it was to the father's lifetime, [1] would not, in our opinion, extend to any such lengths. And the unfortified conclusion by petitioner, and his unselfish use of the funds, praiseworthy as they may be, do not succeed in creating a legal, or even moral limitation upon his right to this income superior to the acts of the testatrix herself. To quote from an authority in the State of New York, where, as petitioner recognizes in his brief, the "cases are representative of the typical holdings," ( In re Atkins' Will, 137 N.Y.S. 88, 91): "To believe another to be trustworthy and to request him to justify such belief in respect to a conveyance or devise to him must *119 fall far short of erecting a trust as the estate conveyed or devised, unless the estate is both given and taken upon the trust not only asserted but defined. (Italics added)." Concluding as we do that the only trust imposed upon the bequest to petitioner was terminated at his father's death, we are compelled to sustain the deficiency on the ground that the income in controversy was legally, morally, actually, and beneficially that of petitioner. The small penalties imposed for failure to file a return are apparently not otherwise contested. No evidence on the subject was introduced and no argument appears in the briefs. Accordingly these, likewise, are sustained. Decision will be entered for the respondent. Footnotes
1. "* * * when my grandmother made the will out, that one-third was to be considered as a separate sum to take care of my father's needs during his lifetime. "Q. That was the understanding between you and your grandmother?" "A. Correct."↩